# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CA-01632-SCT

*PAW PAW ISLAND LAND CO., INC., AND*
*WARREN COUNTY, MISSISSIPPI*
*v.*

*ISSAQUENA AND WARREN COUNTIES LAND*
*CO., LLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/12/2008 |
| TRIAL JUDGE: | HON. VICKI R. BARNES |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | LYNN P. LADNER |
| | JOHN L. LOW, IV |
| | WILLIAM C. SMITH, III |
| | R. E. PARKER, JR. |
| | CLIFFORD C. WHITNEY, III |
| | KENNETH B. RECTOR |
| ATTORNEYS FOR APPELLEE: | LISA ANDERSON REPPETO |
| | MARK D. HERBERT |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 11/10/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., RANDOLPH AND CHANDLER, JJ.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     This appeal involves a claim of a prescriptive easement over land providing access to Paw Paw Island. Paw Paw Island Land Company ("PPILC") now owns most of the island. It alleges that its predecessors in title first used a dirt trail, which later was upgraded to a road to access the island. The road traverses land now owned by Issaquena and Warren Counties Land Company ("IWCLC"). The island, located entirely in the State of Louisiana, was

formed in 1935[1] when the main channel of the Mississippi River was diverted through a large tract of land in Louisiana west of the Mississippi River. The large tract of land and island were owned by Jack Wyly, a Louisiana resident, and Alluvial Lands Company, Ltd., a Louisiana corporation. The diversion caused the land severed from the large tract to be land-locked and water-locked, depending on river stages. Land-based ingress and egress was then limited to access from Mississippi, over land then owned by the Anderson-Tully Corporation ("ATCO"), IWCLC's predecessor. Paw Paw Chute, the former river channel, separates the island from the Mississippi state border. A low-water bridge was built to span the chute. When river levels are high (approximately six months each year), there is no land access to the island. PPILC also claims a prescriptive easement over a parking area and boat launch located on IWCLC's land and allegedly used by PPILC's predecessors in title. When IWCLC sought to confirm the parking area, and to relocate the boat launch and a small segment of the road, PPILC filed this action.[2]

¶2.     While the PPILC-IWCLC trial was ongoing, the Board of Supervisors of Warren County ("Board") demanded by letter that IWCLC remove gates to the road to allow public access to the road, claiming it was a "county road." IWCLC immediately sought declaratory relief in the same court. The cases were consolidated for all purposes. After a trial extending over parts of four years, the chancellor entered an eighty-nine-page Memorandum Opinion and Final Judgment, including findings of fact and conclusions of law, denying a prescriptive

---

[1]This is according to deeds, although oral testimony averred this occurred in 1934.

[2]After the suit was filed, PPILC and IWCLC agreed that PPILC would use same during the pendency of the suit.

easement in favor of PPILC and determining that the disputed portion of the road was private, *inter alia*. PPILC and the Board appealed.

¶3. We find that the chancery court's exercise of jurisdiction over the Board was discretionary, and that the chancellor did not abuse that discretion. We further find that, although the chancellor erred in evaluating one of the elements of prescriptive easement, the final judgment comports with the law of our state. Thus, we affirm the final judgment.

## FACTS AND PROCEDURAL HISTORY

### I. Facts relevant to both cases

¶4. IWCLC owns land on both sides of the Mississippi River levee, the land over which the road is situated, and a small portion of Paw Paw Island. The Board of Mississippi Levee Commissioners ("levee board") owns the levee, and also leases some land to IWCLC. The road begins at Highway 465, also called Eagle Lake Road. The first segment (0.13 miles) runs west from the highway to a gate southwest of the levee. It is a public road without dispute. The road continues west and south (0.47 miles) over IWCLC land to the low-water bridge at Paw Paw Chute. IWCLC bought the property in 2002 from ATCO, a timber company, which had owned the property since 1928. ATCO leased hunting and fishing rights to Big Rack Hunting Club and Oak Ridge Hunting Club. PPILC now owns nearly all of the island, having bought it from another timber company, Crown Zellerbach[3] ("CZ") in July 1995. CZ leased hunting and fishing rights to Paw Paw Island Hunting Club (PPIHC)

---

[3]CZ went through various mergers and name changes during this time. The names include St. Francisville Paper Company, James River, Crown Vantage, and Tembec. These corporations collectively will be called "CZ."

beginning in 1969. CZ terminated the lease on January 20, 1994. In 1994-95, CZ cut timber and hunted on the island, but PPIHC did not hunt on the island. Prior to CZ's purchase of the island in January 1969, it was owned by Wyly and Alluvial.

¶5.    Before creation of the island, the land was part of the land mass of Louisiana and separated from ATCO's property by the main channel of the Mississippi River. When the trail, which later became a road, was first established is unknown. The record is silent as to any use of the property by Wyly and/or Alluvial before and after the island was created. One witness remembered the road was used by hunters, occasional fishermen, foresters, and game wardens as far back as 1953.

¶6.    PPILC alleged in its complaint that it possessed a prescriptive easement created by its predecessors in title, beginning in 1934 and completed by 1944. Tim Evans, an ATCO administrator, testified that hunting had occurred on the island since 1934 and that hunters had used the road to get to the island since that time. He testified that PPIHC later built a boat ramp on ATCO's property. He knew of no permission sought from or granted by ATCO, contrary to the testimony of some hunting-club members. (*See infra* Bankston testimony ¶10). Earnest Wright testified that he first hunted in the area in 1953 along with his father, a PPIHC member, and that there was a gate east of the levee at that time. Wright testified that PPIHC had a clubhouse on the island in 1953, but that no buildings existed on ATCO's property. He stated that PPIHC built and maintained the bridge. Wright recalled nine other members of the club who used the boat ramp to reach the island.

¶7.    Bobby Herrington testified that he hunted on the island as a member of PPIHC, beginning in 1963. He recalled that his father was president of PPIHC in the mid-sixties

4

when electrical service was provided to the island via power lines along the road. He recalled the club's efforts to improve the bridge. Robert Reeder, a former PPIHC member, testified that he hunted on the island beginning in 1963 along with his father and grandfather, both also PPIHC members. He recalled using the boat ramp when it was dirt, then gravel and later, concrete. He testified about improvements made to the bridge, road, and culverts. E.C. Burkhardt, an ATCO forester, testified that he visited the island in 1965 and that it was being used for hunting at that time and that PPIHC had a clubhouse there.

¶8. Although ATCO had hunting lessees, Oak Ridge and Big Rack hunting clubs, no clubhouse was built on ATCO property until 1968. That same year, the gate east of the levee was moved west of the levee, to a point where the current gate is located. Moving the gate was a joint project of Big Rack and PPIHC. John Lindigrin, a former member of PPIHC and now an officer and shareholder of PPILC, testified that moving the gate was a mutual decision. John Byram, a Big Rack member, testified that Big Rack moved the gate because the levee board required them to allow public access to the levee. The current levee-maintenance contract between the levee board and IWCLC prohibits any gates obstructing public access to the levee and the road atop the levee. David McDonald, a Big Rack member who is now a county supervisor, testified that he took part in the gate project and that it was done to prevent vandalism by trespassers. The gate was secured by a chain with multiple padlocks on it. Unlocking any one of the padlocks released the chain. Earnest Wright testified that ATCO, Big Rack, and PPIHC each had a lock on the gate. No testimony was adduced that Wyly and/or Alluvial had a lock on this gate or the prior gates.

¶9.     CZ bought the island in 1969. CZ and PPIHC improved the road and bridge. Freddie Hatcher, a CZ road-maintenance foreman, testified that, when CZ bought the property, the road was "a little old narrow [dirt] trail" with gravel in some spots. He stated that CZ graveled and widened the road from the levee to the island, pulled ditches, sloped the banks, and improved the bridge. Hatcher said he worked on the road annually through 1994, spending six to eight weeks a year there during CZ's timber operations. Pat Weber, a CZ manager, testified that the bridge was a "very crude low water bridge." Lindigrin and others testified that CZ improved the bridge by installing a flatbed rail car. Carl Clay, who later did road and bridge maintenance work for PPILC, testified that he crossed the bridge with his road grader. Since then, at least ten mobile homes have been transported across the bridge.

¶10.    CZ and PPIHC also improved the boat launch and parking area. Weber testified that the boat launch and parking area already had been in use when CZ bought the property. Bobby Bankston, a PPIHC board member, testified that he and his brother, also a PPIHC member, built the concrete boat ramp using club funds. Bankston stated that Weber, a CZ manager, approved the project, including the location of the ramp.

¶11.    Evidence was offered that, during the time the two properties were *owned* by timber companies, usage of the lands was governed by the timber-industry custom of neighborly courtesy. Evans testified that both companies crossed the property of the other without any formal agreement and that each maintained the road as necessary to "move wood." Jeff Portwood, a CZ manager, testified that the companies and their hunting lessees used the same road, and that each of them had a lock on the gate. PPILC stipulated that ATCO and CZ had

6

allowed each other to use the road. IWCLC also presented evidence that some PPIHC members in the 1970s and 1980s believed their use had been permissive.

¶12. In 1994, CZ terminated PPIHC's hunting lease. No hunting and fishing leases for any time period were introduced into evidence. PPIHC's members removed club and personal property from the island. In 1995, CZ sold the island to PPILC, a new corporation, whose shareholders included some of the former members of PPIHC. Lindigrin, who became a PPILC officer, testified that he believed it was part of the sales agreement between CZ and PPILC that CZ would negotiate with ATCO to obtain a written easement for PPILC. Evans, an ATCO manager, testified that he drafted easement agreements for the road and for other locations where ATCO land bordered CZ land, but that CZ never agreed. He stated that he had been concerned about the informal nature of their interactions in the Paw Paw area and elsewhere. After the sale, PPILC continued to discuss an easement with ATCO, but no easement agreement was reached. Martin Lewis, an executive vice-president of ATCO, testified that he offered PPILC a one-year easement in 1996, but that PPILC refused, claiming for the first time it had a prescriptive easement.

¶13. As the new owner of the island after July 1995, PPILC continued to maintain portions of the road and to make other improvements. Lindigrin testified that phone service was instituted on the island in 1997 after underground cables were installed traversing ATCO land.

¶14. In 1997, members of Oak Ridge complained that PPILC vehicles parked near the boat launch were too close to the Oak Ridge clubhouse. Evans informed Lindigrin, and PPILC agreed to park vehicles farther away from Oak Ridge, in an area designated by ATCO.

¶15. In 2002 IWCLC bought ATCO's property. Before after the sale, PPILC negotiated with Marty Elrod, an IWCLC officer and a PPILC shareholder, to obtain a written easement. PPILC also offered to buy the road, parking area, and boat ramp, but no agreement was reached. Prior to the sale, IWCLC had the property surveyed to determine the boundaries and to lay out plats for fifteen home sites. The surveyor recommended relocation of a segment of the road to allow for home sites along Paw Paw Chute. IWCLC replaced the gate southwest of the levee with a new gate in the same location.[4] In 2003, IWCLC informed PPILC by letter that the parking area, boat ramp, and a small segment of the road would have to be relocated to make room for the homes to be built along Paw Paw Chute. PPILC then filed this action in chancery court.

## II.    Facts relevant only to IWCLC versus Warren County

¶16. In 1988, Warren County converted from the beat system to the county-unit system of road maintenance. As a part of this process, the Board carried out the statutorily required functions of inventorying public roads eligible for county maintenance and adopting a map of such roads. A Board resolution dated April 17, 1988, stated, "The inventory list attached hereto shall be the official inventory of County maintained roads and with the names indicated being the official names of said roads and with the amount of mileage indicated being the amount of mileage on said road which is subject to maintenance by the Warren County Board of Supervisors." The county did not present into evidence the map adopted

---

[4]The chain on the gate had locks for PPILC; IWCLC; utility providers; CZ, which retained timber rights to its former property; and ATCO, which retained timber rights to its former property.

by the Board in April 1988. IWCLC presented a 1988 map, revised in April 1989. That map shows a gate located west of the levee. Beyond the gate, the road is indicated by a red-shaded line. The map legend states that a red line means "Road not accepted or maintained by the county as of April 1989." The Board resolution and minutes do not include the length of the road. The road name list attached to the resolution lists only map coordinates, but not road length or the beginning and ending points of the roads. Board members, the county engineer, and a county surveyor testified that, as a result of the 1988 resolution, the road became a county road for 0.6 miles from the highway to the low-water bridge. They testified that "not accepted or maintained" meant that the road southwest of the gate was a county road that was not being maintained. A county road sign near the gate bears the words "End of County Maintenance." Regarding this sign, a county supervisor testified, "We couldn't very well put it beyond the gate, it being closed." No one testified that the county had a lock or key to enter. Two current supervisors testified that they were required to inspect all county roads annually, but that they had never inspected the road beyond the gate.

¶17. In June 2000, the Board carried out the statutorily required functions of preparing and adopting an "official map designating and delineating all public roads on the county road system" and a "county road system register." Miss. Code Ann. § 65-7-4 (Rev. 2005). The register was to include the name of the road and a "general reference to the terminal points and course of each such road." Miss. Code Ann. § 65-7-4(2) (Rev. 2005). A map dated June 2000 was proffered, but was marked for identification only. It shows the road as public for only the first 0.13 miles, beginning at the highway. The road register adopted by the Board on June 19, 2000, indicates that the road is public for 0.13 miles from "HWY 465" to "END

9

OF COUNTY MAINTENANCE." Other county-road registers were introduced into evidence, all of which list the road as public for 0.13 miles. One of these registers, which County Engineer John McKee testified was from "right before 2003," includes two lines for the road. The first line lists the road as public for 0.13 miles from the highway to the levee. The second line lists the road as "PRIVATE" from the levee to "DEAD END." McKee, after refreshing his memory by viewing other maps and registers prepared between 2000 and 2005, all of which stated that the road was public for only 0.13 miles, continued to insist that the road inside the gate was public but not maintained.

¶18. In July 2005, while the PPILC-IWCLC trial was ongoing, PPILC sought intervention by the Board. By that time, IWCLC had installed an additional gate, requiring PPILC to use the new segment of the road, which exhibits indicate is closer to the bridge accessing the island. PPILC attended an informal meeting of the Board on July 14, 2005. The next day, PPILC wrote the Board a letter requesting that it order IWCLC to remove the gates, allow public access to the old road,[5] and cease construction of houses on IWCLC's own land. The Board received the letter at its official meeting on July 19. The record of that meeting does not indicate any action taken by the Board. Yet, on July 21, the Board attorney sent IWCLC a letter ordering it to remove the gates, allow public access, and cease construction. According to the testimony of Board members, both PPILC and IWCLC had an opportunity to meet with the Board before the next official meeting on August 1, 2005. At that meeting,

---

[5]This position is contrary to the existence of a private prescriptive easement. PPILC maintained at trial it possessed a prescriptive easement acquired by a prior owner. PPILC adopted its former position in its brief to this Court, wherein it joined the county's legal position that the road was public.

10

the Board passed a resolution authorizing the Board attorney "to take whatever steps are necessary in regards to the .06 of a mile (sic) of public road referred to as Paw Paw Road and to proceed with haste and deliberation to get that matter resolved as soon as possible." Less than two hours after the resolution passed, IWCLC filed in chancery court a twenty-two-page complaint for declaratory and injunctive relief.

### III. Procedural history

¶19. PPILC filed suit in May 2003 after IWCLC informed it that the road segment, parking area, and boat ramp would be relocated. IWCLC continued with its plans to relocate a segment of the road and build houses. When trial began in December 2003, IWCLC already had completed the new road segment, which was approximately 420 feet from the old road at the farthest point. IWCLC also had the power lines and phone cables moved to the new segment. Lindigrin testified that the new road was not as good as the old one, as it could not handle house trailers and heavy trucks. This dispute was resolved in the interim by an agreed order, in which IWCLC allowed PPILC to: (1) use the new road segment and make improvements at its own expense, (2) use the boat ramp, (3) use the previously defined parking area.

¶20. By July 2005, each of the fifteen IWCLC members had been deeded a home site. One house had been completed, and ten others were in progress. Some of the homes were to be built directly on a segment of the old roadbed. On July 14, 2005 (the same day PPILC attended the informal meeting of the Board), IWCLC informed PPILC that a new gate was in place, blocking access to a portion of the old road.

11

¶21. After IWCLC filed its declaratory-judgment action in August 2005, the county filed an answer and counter-claim, and did not raise jurisdiction as an issue. The chancellor consolidated the cases without objection in October 2005. The trial resumed in February 2007 and was completed in April 2007. The chancellor requested additional briefs. In October 2007, the county first filed a motion to dismiss for lack of subject-matter jurisdiction.

¶22. In September 2008, the chancellor issued judgment, finding *inter alia*: (1) jurisdiction of the chancery court was proper, as IWCLC's complaint was in response to the Board's letter and not a Board judgment; (2) Paw Paw Road is public for the first 0.13 miles and private thereafter; (3) PPILC failed to prove a prescriptive easement; and (4) the levee board was not an indispensable party.

## ISSUES[6]

¶23. The issues raised by PPILC are:

    I.      Whether the chancellor committed errors of law in applying the elements of a prescriptive easement.

    II.     Whether the evidence requires reversal of the chancellor's judgment and rendering a judgment in favor of PPILC.

¶24. The issues raised by the Board are:

    III.    Whether the chancellor had jurisdiction to review an action of the Board.

    IV.    Whether the chancellor erred in finding the disputed portion of the road to be private.

---

[6]The issues raised by all parties have been edited and consolidated for clarity and brevity.

¶25.  IWCLC raised the following issues in the alternative:

> V.  Whether the chancellor erred in excluding documents proffered by IWCLC.
>
> VI.  Whether the chancellor erred in finding that the Mississippi Board of Levee Commissioners was not a necessary party.

Our decision moots issues V and VI.

## ANALYSIS

¶26.  In ***Lowrey v. Lowrey***, 25 So. 3d 274 (Miss. 2009), this Court stated the following:

> "'A chancellor's findings of fact will not be disturbed unless manifestly wrong or clearly erroneous.'"  "However, the Court will not hesitate to reverse if it finds the chancellor's decision is manifestly wrong, or that the court applied an erroneous legal standard."  A chancellor's conclusions of law are reviewed de novo.

***Id.*** at 285 (citations omitted).

> **I.  Whether the chancellor committed errors of law in applying the elements of a prescriptive easement.**
>
> **II.  Whether the evidence requires reversal of the chancellor's judgment and rendering a judgment in favor of PPILC.**

¶27.  To establish a prescriptive easement, use must be proven by clear-and-convincing evidence.  Each of the following elements must be met by the same clear and convincing standard.  The use must be: (1) open, notorious, and visible; (2) hostile; (3) under claim of ownership; (4) exclusive; (5) peaceful; and (6) continuous and uninterrupted for ten years. ***Sharp v. White***, 749 So. 2d 41, 42 (Miss. 1999).  Use by express or implied permission or license, no matter how long continued, cannot ripen into an easement by prescription since adverse use is lacking.  ***Id.***  Whether use is prescriptive or permissive is ordinarily a question of fact to be determined by the chancellor.  ***Id.*** at 43.  The chancellor found that PPILC had

13

failed to prove three elements: hostile, under claim of ownership, and exclusive. The chancellor erred on exclusivity. However, we find no error by the chancellor in decreeing that evidence was lacking to prove, by clear and convincing evidence, the hostility and claim-of-ownership elements.

¶28. For all times relevant to this case, the ownership of the affected parcels and the legal relationship between them can be reduced to three distinct "eras." For each of these eras, there is at least one reason why no prescriptive easement was proven.

¶29. The first era began in 1934 and ended in 1969. During this time, the putative dominant estate was owned by Jacky Wyly and the Alluvial Lands Company, Ltd. The putative servient estate was owned by ATCO. ATCO, a timber company, used its land for timber-farming operations. The record is silent that Wyly and/or Alluvial used the road. Absent proof that the titled owner of the putative dominant estate used the road, it is axiomatic that adverse use cannot be proven. Absent adverse use, the hostile element cannot be satisfied.

¶30. The second era began in 1969 – when Wyly and Alluvial sold the putative dominant estate to CZ – and lasted until 1995. Like ATCO, CZ was a timber company and began using its land for timber-farming operations. In addition, CZ leased hunting and fishing rights on the island to PPIHC. This lease lasted from 1969 to 1994, nearly the entire second era.

¶31. The third era commenced in 1995 upon the sale of the dominant estate to PPILC, a company that included several former PPIHC members. The enmity between the parties, eventually giving rise to this suit, occurred during the third era.

14

## A. Hostile

¶32. The chancellor gave credence to the timber-industry custom of neighborly courtesy. She found that this custom was in effect from 1969 (when CZ obtained ownership) until 1995 (when CZ sold the property), and she found that CZ had implied permission to use the road crossing ATCO's land. She found that no one objected to this implied permission until 2003, thus, PPILC could not tack its prescriptive-easement claim to the time CZ owned the property.

¶33. The chancellor discussed whether PPILC was entitled to a presumption of hostility. *See McCain v. Turnage*, 238 Miss. 44, 117 So. 2d 454, 455 (1960). We all can agree, in the absence of proof, the dominant estate is entitled to a presumption of hostility, if use by the owner has been shown. However, the *McCain* rule, as applicable in this case, is as follows:

> where . . . a *use* of lands of another for roadway purposes has been open, visible, continuous, and unmolested since some point in time anterior to the memory of aged inhabitants of the community, such use will be presumed to have originated adversely.

*Id.* at 455 (emphasis added). Here, no use by the pre-1969 owners was shown. As the rule presupposes use, it does not apply. Thus, we need not consider whether the presumption of hostility should apply for that time frame.

¶34. The chancellor concluded the discussion of the hostile element as follows: "The evidence is insufficient to prove that [PPILC], or any of [its] predecessors, used Paw Paw Road without the implied permission of [ATCO]." The chancellor found that PPILC had failed to prove by clear and convincing evidence the predecessors' use was hostile.

¶35. No evidence was offered of use of the road by CZ's predecessors in title, Wyly and Alluvial. We cannot say that the chancellor erred in finding a lack of clear and convincing evidence of use, much less hostile use, from 1934 until 1969.

**B.     Claim of ownership**

¶36. The chancellor found insufficient evidence that any of the early "owners, loggers, and hunters" made a claim of ownership. Further, she could not find "any reasonable inference that the 'road' was owned by them."

¶37. PPILC argues that the chancellor used the adverse-possession standard for the claim-of-ownership element, requiring it to show that it (or its predecessors in title) had claimed to own the road, instead of showing a claim to use the road. PPILC asserts that the chancellor reversed the burden of proof, requiring it to "prove a negative," the absence of objection, rather than requiring IWCLC to show permission. PPILC argues that the neighborly-courtesy evidence would be irrelevant if the chancellor had properly found that a prescriptive easement already had vested by that time (*i.e.*, before January 1969).

¶38. In determining that evidence was lacking that Wyly or Alluvial had claimed ownership of a right to use the road, the chancellor was correct. "One claiming a prescriptive easement need not claim to own the land itself, but he or she must claim to own an easement." *Threlkeld v. Sisk*, 992 So. 2d 1232, 1239 (Miss. Ct. App. 2008) (citing *Delancey v. Mallette*, 912 So. 2d 483, 488 (Miss. Ct. App. 2005)). In the prescriptive-easement cases reviewed, the dispute centered on owners of dominant estates claiming prescriptive easements over servient estates, not hunters, occasional users, *et cetera*. Nothing in the record shows that Wyly and Alluvial ever used the road, much less claimed ownership of a

16

right to use the road.  The record is replete that PPILC's immediate predecessor in title, CZ, used the road without a claim of ownership, following industry standards of neighborly courtesy.  PPILC unsuccessfully argues that nonowners' use of the road should satisfy this requirement.  However, the presence of or use of the road by persons other than the owners of the dominant estate does not obviate a claim by the owner.  Here, the record is devoid of any claim by Wyly and/or Alluvial.  PPILC cannot tack its claim to a hunting lessee, even assuming *arguendo* that Wyly and Alluvial leased hunting and fishing rights,[7] and if any right existed via a lease, it expired with the termination of the hunting and fishing lease in 1994.  Tacking is a principle used to connect continuous use of *former property owners* with use of subsequent property owners.  *See* **Rutland v. Stewart**, 630 So. 2d 996, 999 (Miss. 1994).

¶39.   Thus, we cannot say the chancellor erred in finding this element lacking for that era.

### C.   Exclusive

¶40.   The chancellor quoted **Keener Properties, LLC v. Wilson**, 912 So. 2d 954 (Miss. 2005). and noted that "exclusivity" has a different meaning regarding prescriptive easements than it does with adverse possession.  *See* *id.* at 956-57.  However, she distinguished **Keener** and found that exclusivity had not been met because PPILC had not shown "sole dominion." PPILC argues that the chancellor misinterpreted **Keener**, requiring it to show sole dominion over the road, instead of showing "a claim to the right to use the road over and above that of a member of the indiscriminate public."  *Id.* at 957.

---

[7]No hunting and fishing leases for any time period were introduced.

¶41.  *Keener* defines exclusivity as it applies to adverse possession as well as prescriptive easement.  *Id.* at 956-57.  Joint use does not defeat a prescriptive-easement claim.  *Keener* clarified the "subtle distinctions" between adverse possession and prescriptive easement as follows:

> the term "exclusive" as it relates to a prescriptive easement does not mean to keep all others out, but to show a right to use the land above other members of the general public. [The dominant estate holders] are correct when they assert that to meet the exclusivity requirement, they did not have to exclude others or the general public from using the road across Keener's property.  They were only required to show a claim to the right to use the road over and above that of a member of the indiscriminate public.

*Id.* at 957.  *See also McCain*, 117 So. 2d at 455; *Threlkeld*, 992 So. 2d at 1239-40;  *Griffin v. Brian Dev. Co., Inc.*, 938 So. 2d 337, 340 (Miss. Ct. App. 2006); *Moran v. Sims*, 873 So. 2d 1067, 1069-70 (Miss. Ct. App. 2004).  If the chancellor erred as to exclusivity, it is of no consequence, as other elements were not proven by clear and convincing evidence.

### III.  Whether the chancellor had jurisdiction to review an action of the Board of Supervisors.

¶42.  Declaratory judgments are controlled by the Mississippi Rules of Civil Procedure. Declaratory-judgment relief may be sought in either chancery or circuit court, usually dependent upon traditional notions of their jurisdictions.  Suits involving claimed easements, public-versus-private-road disputes, removal of gates and locks, and injunctive relief to remove obstructions, *inter alia*, have been tried in both circuit and chancery courts, predominantly chancery, a proposition so well-settled that no citation is necessary.

¶43.  The Board relies exclusively on Mississippi Code Section 11-51-75, which requires "[a]ny person aggrieved by a judgment or decision of the board of supervisors" to appeal

within ten days to circuit court using a bill of exceptions. Miss. Code Ann. § 11-51-75 (Rev. 2002). Application of this section presupposes the judgment or decision challenged was rendered by an official act of the Board, duly recorded in its minutes. The chancellor found that the Board's letter to IWCLC was sent before the Board lawfully authorized such action. Official acts of a board are voidable only if found to be arbitrary or capricious. A board's minutes are evidence of its actions. There being no minutes in the record other than those of the August 1, 2005, meeting, the chancellor found that the Board's letter was not precipitated by a judgment or decision of the Board. This Court has stated "the property of the citizen . . . should not be lost to him . . . particularly so where there has been no conveyance or dedication of the right of way by deed or when there is no record evidence of its having been appropriated for public use by constitutional and statutory procedure." *Armstrong v. Itawamba County*, 195 Miss. 802, 810, 16 So. 2d 752, 754 (1944). The chancellor found that IWCLC's complaint was filed in response to the letter, and not in response to the Board's subsequent resolution. Finding that Mississippi Code Section 11-51-75 does not apply, we find that the chancellor properly exercised jurisdiction.

¶44. The subject matter of this case is the status of a road – public or private, and if private, the question is whether an easement existed. In case after case cited by all parties, the subject-matter jurisdiction of the chancery court was never in doubt. To argue otherwise is without merit. Thus, we find the chancery court did not abuse its discretion in exercising jurisdiction.

IV. **Whether the chancellor erred in finding the disputed portion of the road to be private.**

19

¶45. The county argues that: (1) the Board's actions in 1988 made Paw Paw Road a county road for 0.6 miles, and that such a determination is not subject to collateral attack; (2) the chancellor's ruling effectively means that the county lost "right, title, and ownership" of the road because of an erroneous register entry in 2000; (3) IWCLC, as the challenger in a title action, had the burden to prove its claim of ownership of the road; (4) the county has the right to review, correct, and amend its prior actions, so that it is not subject to losing its assets; (5) the county holds a prescriptive easement over the road.

¶46. The county argues that 0.6 miles of Paw Paw Road became public solely by the Board's inclusion of the road on the county road map in 1988. The facts indicate that this assertion is not correct. The road was gated at that time (as depicted on the map), and all witnesses testified it had been gated for decades and has continued to be ever since. No evidence was presented of public maintenance inside the gate for at least the last thirty years, and only sporadically before that. A county road sign indicates that county maintenance ends at the gate. Two county supervisors testified that, as a part of their obligation to inspect all county roads, they never inspected the road beyond the gate. The map admitted into evidence indicates that the road inside the gate was "not accepted or maintained" by the county as of 1989.

¶47. The county also claimed at oral argument that it owned many roads that are not county-maintained. This included an entire subdivision in which the developer had dedicated the roads to the county, but had not brought the roads up to county maintenance standards. This argument is unhelpful, as there is no evidence of dedication of the road to the county. The county relied on its 1988 resolution as evidence that the road had become public.

20

Further, a county supervisor testified that he had no knowledge of the road having been dedicated or becoming a county road by any other statutory method. *See **Ladner v. Harrison County Bd. of Supervisors***, 793 So. 2d 637, 639 (Miss. 2001).

¶48.    The county concedes that the 2000 register was in error, but asserts that the chancellor ruled that the county had lost "right, title, and ownership" of the road because of that error. The county argues that the ruling converts the 2000 register into a title-transfer document, taking the road from the county and giving it to IWCLC. The county argues further that, having had title to the road, such title could not be taken absent the statutory process of declaring the road abandoned. *See* Miss. Code Ann. § 65-7-121 (Rev. 2005). The chancellor made no such ruling.

¶49.    The county now claims it holds a prescriptive easement over the road. This argument was raised for the first time in the county's reply brief to this Court. As it is improper to raise new arguments in a reply brief, the Court is under no obligation or duty to consider such argument. *See **Overstreet v. Allstate Ins. Co.***, 474 So. 2d 572, 576 (Miss. 1985).

¶50.    The chancellor cited the statute that requires a board of supervisors "by appropriate action spread on its minutes" to establish or accept the road and include it "in the official record of the county road system as provided in Section 65-7-4." Miss. Code Ann. § 65-7-1(3) (Rev. 2005). Mississippi Code Section 65-7-4 requires a board to "prepare and adopt an official map designating and delineating all public roads on the county road system." Miss. Code Ann. § 65-7-4(1) (Rev. 2005). Boards also are required to "prepare and adopt a county road system register in which shall be entered: (a) The number and name of each

21

public road on the county road system [and] (b) [a] general reference to the terminal points and course of each such road." Miss. Code Ann. § 65-7-4(2) (Rev. 2005).

¶51. The chancellor also cited caselaw outlining the three exclusive methods for creating a public road: "prescription, dedication, or pursuant to statutory provisions." *Ladner*, 793 So. 2d at 639. *See* Miss. Code Ann. § 65-7-57 (Rev. 2005) (petition); Miss. Code Ann. § 65-7-89 (Rev. 2005) (eminent domain).

¶52. The chancellor found that the Board had contended that the map revised in 1989 was the map adopted by the Board in 2000. The chancellor found that the index to the 1989 map "lists Paw Paw Road . . . as being .60 of a mile in length; however, the actual map shows the road to be 'not accepted or maintained' past the levee/gate," according to the red-shaded line and the map legend. The chancellor recounted the testimony of a county supervisor who said he had never inspected the road beyond the gate. The chancellor took note of the road registers, all of which stated the road was public for only 0.13 miles, and one of which stated that the road beyond the gate was "private" and "not maintained." The chancellor then cited the statute that establishes that, where a conflict exists between a road register and a county map, the "register shall have priority . . . ." Miss. Code Ann. § 65-7-4(5) (Rev. 2005). The chancellor found that the county's argument – that the register indicated only the maintained roads, not the full length of roads owned by the county – was in conflict with the statute mandating the road register, which requires a listing of "each public road on the county road system," including a "general reference to the terminal points and course of each such road." Miss. Code Ann. § 65-7-4(2) (Rev. 2005). The chancellor concluded "that Paw Paw Road is public for .13 miles and private for the remainder."

22

¶53.    The statutes cited offer no support for the county's position. In 1988, the county was carrying out its function to "inventory" county roads, indicating that the county was to make a "list" of what it already had, not acquire new roads. The chancellor correctly identified the only methods for creating a public road. The county made no claim at trial that the disputed portion of the road had ever become a public road by any of these methods, instead relying on the 1989 map for its claim. The Legislature has made clear its intent regarding these map-and-registry requirements, as follows:

> The Legislature of the State of Mississippi finds and determines as a matter of public policy and legislative intent that the proceedings and public hearing required for initial adoption of the official map and county road system register required by Section 65-7-4, Mississippi Code of 1972, are not intended to lay out, open, designate or otherwise establish new public roads, but to document and record existing roads which are, at the time of the initial adoption of said map and register, adjudicated by the board, consistent with fact, to be public roads by dedication, under the methods provided by statute, or by prescription and required by public convenience and necessity.

Miss. Code Ann. § 65-7-4.1 (Rev. 2005).

¶54.    We find no error by the chancellor, either factually or legally, in finding that the road west of the gate is private and that the county never had title to the road.

## CONCLUSION

¶55.    Accordingly, we affirm the final judgments of the chancellor.

¶56.    **AFFIRMED.**

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.**

23